FRANK KELL, PETITIONER, ET AL.,[1] *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 65921, 65924, 69677–69686.  Promulgated September 27, 1934.

*John B. King*, *Esq.*, and *Harry C. Weeks*, *Esq.*, for the petitioners.
*Frank B. Schlosser*, *Esq.*, *DeWitt M. Evans*, *Esq.*, and *R. B. Cannon*, *Esq.*, for the respondent.

---

[1] Proceedings of the following petitioners are consolidated herewith: Mrs. Frank Kell; Sadie Bullington; Mrs. John F. O'Donohue; Joe A. Kell; Mrs. Wiley Blair, Jr.; Mrs. Malcolm Putty; Orville Bullington; Willie May Kell; John F. O'Donohue; T. P. Duncan; and Mrs. T. P. Duncan.

214

OPINION.

Adams: We will consider first the issue common to all of these cases, which is whether or not the reorganization of the four Texas corporations was a nontaxable reorganization, and whether petitioners received any taxable income therefrom.

Prior to January 2, 1929, there was in existence a group of corporations engaged in the grain and milling business known as the "Kell Mills." Four of these were Texas corporations and two were Oklahoma corporations. Their names and locations were: Wichita Mill & Elevator Co., a Texas corporation, Wichita Falls, Texas; Waco Mill & Elevator Co., a Texas corporation, Waco, Texas; Kell Mill & Elevator Co., a Texas corporation, Vernon, Texas; Great West Mill & Elevator Co., a Texas corporation, Amarillo, Texas; Oklahoma City Mill & Elevator Co., an Oklahoma corporation, Oklahoma City, Oklahoma; Perry Mill & Elevator Co., an Oklahoma corporation, Perry, Oklahoma.

Each of the petitioners was a stockholder in one or more of the Texas corporations and petitioners Frank Kell and Joe A. Kell were also stockholders in the Oklahoma corporations. Petitioner Frank Kell owned or controlled a majority interest in each of the corporations.

In 1928 and subsequent years the General Mills, Inc., a Delaware corporation, was extensively engaged in the grain and milling business in various parts of the United States, and during 1928 negotiations were had between General Mills, Inc., and the executive heads of Kell Mills for the purpose of the acquisition by General Mills, Inc., of the assets and properties of the Kell Mills.

On account of certain provisions of the Texas antitrust laws it was believed advisable to contract with the stockholders of the Texas

corporations to dissolve those corporations and convey their assets to General Mills, Inc., in the process of dissolution. In order to accomplish this purpose Frank Kell, Joseph Kell, T. C. Thatcher, and T. P. Duncan, acting for themselves and on behalf of other stockholders, entered into a contract on December 18, 1928, with General Mills, Inc., by which it was provided in substance that the Texas corporations should be dissolved and that their entire business, assets, and good will should be conveyed to General Mills, Inc., and that the latter was to assume all outstanding liabilities. The consideration was the issuance of preferred and common stock of General Mills, Inc., to the stockholders of the Texas corporations.

Similar contracts were made with the Oklahoma corporations at the same time, but these were made directly with the corporations and there was no prior dissolution before conveyance of the properties.

Between December 18, 1928, and January 2, 1929, all of the stock in the Texas corporations was transferred to the names of Frank Kell, Joe A. Kell, and T. P. Duncan. This was done for the purpose of convenience in handling the various matters involved in the reorganization.

On January 2, 1929, the four Texas corporations were duly dissolved in accordance with the laws of Texas, and at that time petitioner Frank Kell was president of each of the Texas corporations and he, T. P. Duncan, and Joe A. Kell constituted the entire board of directors of each company. Under the terms of the contract the date of purchase was January 3, 1929.

On January 25, 1929, Frank Kell, T. P. Duncan, and Joe A. Kell, as trustees of the dissolved Texas corporations and individually, conveyed the properties and assets of the Texas corporations to General Mills, Inc. A number of conveyances were necessary, of which the following is a sample:

STATE OF TEXAS)
COUNTY OF WICHITA)

WHEREAS, prior to and on the 2nd day of January A.D. 1929, Great West Mill & Elevator Company was a corporation duly incorporated under and by virtue of the laws of the State of Texas; and,

WHEREAS, on the said 2nd day of January 1929, said corporation was duly dissolved in accordance with the laws of the State of Texas; and,

WHEREAS, at the time of the dissolution of said corporation, Frank Kell was the President thereof, and together with Joe A. Kell and T. P. Duncan constituted the Board of Directors of said corporation, and upon the dissolution thereof became Trustees of the creditors and stockholders of said corporation under the Statutes of Texas; and,

WHEREAS, at the time of the dissolution of said corporation, the said Frank Kell, Joe A. Kell and T. P. Duncan were also the sole stockholders of said corporation, owning all of its shares of stock;

Now, Therefore, Know All Men by These Presents, that we, the said Frank Kell, Joe A. Kell, and T. P. Duncan, of the County of Wichita, and State of Texas, as such Trustees, aforesaid, and individually, for and in consideration of the sum of One ($1.00) Dollar, cash to us in hand paid by General Mills, Inc., a Delaware corporation, and of other valuable considerations, the receipt of which is hereby acknowledged and confessed, have granted, sold and conveyed, and by these presents do grant, sell and convey unto the said General Mills, Inc., a Delaware Corporation, all that certain real estate, lying and being situated in the County of Potter, State of Texas, and more particularly described as follows: * * * [Description of property not material.]

To Have and to Hold the above described premises, together with all and singular, the rights and appurtenances thereto in any wise belonging unto the said General Mills, Inc., a Delaware corporation, aforesaid, its successors and assigns forever, and we do hereby bind ourselves, our heirs, successors, executors and administrators, to warrant and forever defend all and singular the said premises unto the said General Mills, Inc., a Delaware corporation, aforesaid, its successors and assigns, against every person whomsoever lawfully claiming or to claim the same, or any part thereof.

Witness our hands at Wichita Falls, Texas, this 25th day of January, A.D. 1929.

Frank Kell
T. P. Duncan
Joe A. Kell

Individually and as Trustees of
Great West Mill & Elevator Company.

There were no transfers of title or of the assets of the Texas corporations from the corporations to Frank Kell, T. P. Duncan, and Joe A. Kell, but the title to said properties vested in them as trustees in dissolution by virtue of article 1388, Revised Civil Statutes of Texas, which is as follows:

Art. 1388. Liquidation by Officers. Upon the dissolution of a corporation, unless a receiver is appointed by some court of competent jurisdiction, the president and directors or managers of the affairs of the corporation at the time of its dissolution shall be trustees of the creditors and stockholders of such corporation, with power to settle the affairs, collect the outstanding debts, and divide the moneys and other property among the stockholders after paying the debts due and owing by such corporation at the time of its dissolution, as far as such money and property will enable them after paying all just and reasonable expenses; and for this purpose they may in the name of such corporation, sell, convey and transfer all real and personal property belonging to such company, collect all debts, compromise controversies, maintain or defend judicial proceedings, and exercise full power and authority of said company over such assets and property. Said trustees shall be severally responsible to the creditors and stockholders of such corporation to the extent of its property and effects that shall have come into their hands.

At the same time the Oklahoma corporations, acting through their regular executive officers, conveyed the properties of those corporations to General Mills, Inc. On January 2, 1929, when the Texas

corporations were dissolved, their liabilities, which were to be assumed by General Mills, Inc., were as follows:

| | |
|---|---|
| Wichita Mill & Elevator Co | $351,961.58 |
| Waco Mill & Elevator Co | 275,963.26 |
| Kell Mill & Elevator Co | 96,375.60 |
| Great West Mill & Elevator Co | 1,177,123.15 |

Upon the delivery of these conveyances General Mills, Inc., issued and delivered its common and preferred stock as agreed upon, being 52,151.24 shares of common stock and 13,274.86 shares of preferred stock in General Mills, Inc. Of this, 39,062.09 shares of common stock and 9,955.02 of preferred stock were issued in the name of petitioner Frank Kell, and the remainder was issued in the names of Frank Kell, Joe A. Kell, T. P. Duncan, and T. C. Thatcher, as joint tenants. Thus all of the stockholders of the Kell Mills became stockholders in General Mills, Inc., and Frank Kell, head of the Kell Mills, became a director of General Mills, Inc., and all of the officers of the Kell Mills, except T. P. Duncan, became connected with General Mills, Inc., or its subsidiary companies.

In his determination of the deficiencies the respondent ruled that when the Texas corporations were dissolved the distribution of their assets to a committee acting for themselves and others constituted a liquidation and a constructive receipt by the stockholders of liquidating dividends, resulting in a taxable transaction. Petitioners on the other hand contend that the transaction was a nontaxable reorganization under section 112 of the Revenue Act of 1928.

There was no corporate action taken authorizing or declaring a liquidating or any other form of dividend, nor was there any distribution of any of the assets of the corporations to the stockholders.

We think the answer to the question is to be found in what capacity Frank Kell, T. P. Duncan, and Joe A. Kell were acting in consummating the transaction and that this is answered in favor of petitioners by our decision in *Taylor Oil & Gas Co.*, 15 B.T.A. 609; affirmed in 47 Fed. (2d) 108; certiorari denied, 283 U.S. 862.

The Taylor Oil & Gas Co. was a Texas corporation, which had been negotiating with the Magnolia Petroleum Co. for the sale of practically its entire assets to the Magnolia Petroleum Co. In order to avoid taxes at the corporate rate, if the sale were made by the corporation, it was decided to dissolve the corporation and have the sale made through the president and directors of the corporation as trustees of the stockholders.

Resolutions were adopted by the stockholders appointing the president and directors trustees for the stockholders and authorizing dissolution of the corporation and the subsequent sale of the assets to the Magnolia Petroleum Co. for $150,000 cash. This was carried out

by the trustees and the question arose as to whether or not the profit resulting from the transaction accrued to the corporation or directly to the stockholders in a liquidating dividend. The Board held that under the laws of Texas a corporation may continue for the purposes of liquidation for three years after formal dissolution and during such period the president and directors of the corporation are trustees for the stockholders and creditors of the corporation and that the sale of the Taylor Co.'s assets by the trustees was a sale by the corporation and the profit accrued to it.

This case was affirmed by the Circuit Court of Appeals for the Fifth Circuit in *Taylor Oil & Gas Co.* v. *Commissioner*, 47 Fed. (2d) 108. In its opinion the Circuit Court of Appeals said:

*It is contended by petitioners that the legal title to the property vested in the president and directors as trustees by operation of law immediately upon the consummation of the necessary steps to effect the dissolution,* and that the sale of the property made thereafter was for the benefit of the creditors and stockholders and not for the company. Various decisions of the Texas courts are relied upon to sustain this position, but we do not consider them in point.

Under the law of Texas, the existence of a corporation may be extended for three years for the purpose of settling its affairs. Vernon's Annotated Civil Statutes Texas, art. 1389. Article 547 tr. Reg. 45, (1920), adopted to cover situations such as here presented, provides in part as follows: " When a corporation is dissolved, its affairs are usually wound up by a receiver or trustees in dissolution. The corporate existence is continued for the purpose of liquidating the assets and paying the debts, and such receiver or trustees stand in the stead of the corporation for such purposes. Any sales of property by them are to be treated as if made by the corporation for the purpose of ascertaining the gain or loss."

This is a reasonable regulation, and should be given effect. *Universal Battery Co.* v. *U.S.*, 281 U.S. 580, 50 S.Ct. 422, 74 L. Ed. 1051.

It may be doubted that the contract of sale was merely executory. Except for executing the formal deed, there was nothing to be done. The price, the thing, and the effective time of delivery, December 15, 1919, had been agreed upon. But, if it was executory, it was still the contract of the company to be executed before there could be any liquidation of its affairs. Conceding for the purpose of argument that the legal title to the property vested in the trustees by the dissolution, no part of the title passed to the stockholders thereby. The real owner was still the company until such time as its affairs were liquidated, the debts paid, and the residue distributed to the stockholders. The profit on the transaction was earned by the corporation, and the assessment of the taxes based thereon was valid.

A large number of cases have been decided by this Board and the courts to the effect that, where the sale of the corporate assets has been agreed upon before dissolution of the corporation and before the creation of a trust, a sale by the trustee is a sale by the corporation. *Commissioner* v. *Lexington Ice & Coal Co.*, 62 Fed. (2d) 906; *Fred A. Hellebush et al., Trustees*, 24 B.T.A. 660; affd., 65 Fed. (2d) 902; *S. A. MacQueen Co.*, 26 B.T.A. 1337; affd., 67 Fed. (2d) 857; *Nace Realty Co.*, 28 B.T.A. 467.

In the cases under consideration there was no purpose to dissolve and liquidate the Kell Mills and distribute their assets or their proceeds among the stockholders. The object and purpose of the entire transaction was to transfer the entire business and assets of the Kell Mills to General Mills, Inc., and have the stockholders in Kell Mills become stockholders in General Mills, Inc. Under such circumstances the dissolution of the Texas corporations was a mere step in the proceeding to accomplish the final result above indicated.

In a somewhat similar transaction in the case of *Teck Hobbs*, 26 B.T.A. 241, we held that where it was necessary to organize a common law trust as a means to carry through the deal, it did not alter the character of the transaction. In the instant cases the character of the transaction was a merger of Kell Mills into General Mills, Inc., and the dissolution of the Texas corporations was merely a means to an end, which was reorganization. *Howard* v. *Commissioner*, 56 Fed. (2d) 781, affirming 20 B.T.A. 207; certiorari denied, 287 U.S. 619.

The dissolution of the Texas corporations did not effect a distribution of their assets to the stockholders. *Milton E. Bickley*, 1 B.T.A. 544; *Mrs. Grant Smith*, 26 B.T.A. 1178; *Whitney Realty Co., Ltd.*, 29 B.T.A. 453.

It seems clear that this was a nontaxable reorganization and is covered by section 112 (b) (4) of the Revenue Act of 1928, which is as follows:

No gain or loss shall be recognized if a corporation a party to a reorganization exchanges property, in pursuance of the plan of reorganization, solely for stock or securities in another corporation a party to the reorganization.

" Reorganization " is defined in section 112 (i) (1). as follows:

The term " reorganization " means (A) a merger or consolidation (including the acquisition by one corporation of at least a majority of the voting stock and at least a majority of the total number of shares of all other classes of stock of another corporation, or substantially all the properties of another corporation) * * *.

These corporations conveyed substantially all of their properties to General Mills, Inc., solely for stock in the latter. *Pinellas Ice & Cold Storage Co.* v. *Commissioner*, 287 U.S. 462.

Treasury Regulations from 1924 to the present have provided in substance that transactions such as this in controversy are nontaxable reorganizations and that sales made by receivers or trustees in dissolution are sales by the corporation.

At the hearing respondent urged as an alternative, in the event that the Board held that the Texas corporations were merged and reorganized rather than dissolved and liquidated, that it was still a taxable transaction under section 112 (c) (1) of the Act of 1928, which is as follows:

If an exchange would be within the provisions of subsection (b) (1), (2), (3) or (5) of this section, if it were not for the fact that the property received in exchange consists not only of property permitted by such paragraph to be received without the recognition of gain, but also of other property or money, then the gain, if any, to the recipient shall be recognized, but in an amount not in excess of the sum of such money and the fair market value of such other property.

Respondent filed no pleading raising this issue, which is utterly at variance with his findings in the deficiency notices. Petitioners insist that the question may not be considered without an appropriate pleading. Without passing on the question of pleading we will determine the question.

Under the contracts for the disposition of the Kell Mills to General Mills, Inc., it was necessary for the Kell Mills to take out certain assets and replace them with other assets or cash. To accomplish this Frank Kell, T. P. Duncan, and Joe Kell borrowed $810,506.95 personally and took out certain assets, principally grain, and replaced them with cash.

On December 18, 1928, a contract was made and entered into between Krank Kell, Joseph Kell, T. C. Thatcher, and T. P. Duncan, as vendors, and the First Security Co., a corporation of the State of New York, and the National City Co., a corporation of the State of New York, vendees, for the purchase by the vendees from the vendors of 14,428½ shares of the common stock of General Mills., Inc. A true copy of this contract is attached to the stipulation of facts and marked "Exhibit 1", and provides in substance that, upon the completion by General Mills, Inc., of the acquisition of the properties of the six corporations and the issuance by General Mills, Inc., of the shares of its common stock and preferred stock, the vendors would sell the number of shares of common stock as above set out.

The circumstances surrounding the making of this contract were related by Frank Kell in oral testimony had at the hearing, and substantiated by T. C. Thatcher. In substance, Kell's testimony was that while negotiations were pending with General Mills, Inc., a representative of the National City Co. approached him with reference to the willingness of himself and the other signers of the contract to sell a portion of the common stock which they were to receive from General Mills, Inc.; that at no time during the negotiations with General Mills, Inc., had General Mills, Inc., ever offered to pay cash in whole or in part for any of the properties, and under the contracts drawn with General Mills, Inc., he and his associates were to get nothing for the assets except stock in General Mills, Inc.; that he was desirous of selling some of the stock in order to meet some obligations and also on account of the condition of

the market at that time; that the contract was made by himself, Joseph Kell, T. C. Thatcher, and T. P. Duncan, contracting only for themselves, whereas in the contract with General Mills, Inc., the same parties had contracted for themselves and the other stockholders in the four Texas mills, for the reason that in the contract with General Mills, Inc., he and the other three named individuals had authority from all the stockholders to make the contract with General Mills, Inc., whereas in making the contract with the bankers, the other stockholders were not consulted, as he and the other named individuals had sufficient stock to comply with the contract, even if the other parties did not desire to participate in the benefits of such contract; and that after the contract was made whereby he and the other three named individuals obligated themselves to sell the stock to the bankers as provided in the contract, he and the three named individuals offered to their other associates the privilege of participating in the contract which had been made, share and share alike, which privilege or opportunity all accepted.

The debts created by Frank Kell and others to adjust the assets of the Kell Mills to conform to the requirements of the General Mills, Inc., contracts were largely paid from the sale of stock to the underwriters and of some on the open market, which amounted in all to $1,238,415.86. It is the alternative contention of the respondent that the sale of this stock and receipt of the consideration therefor constituted the receipt of cash and made the reorganization taxable under section 112 (c) (1) of the Revenue Act of 1928.

We think not, as the sale of the stock was plainly a separate transaction. Cash formed no part of the consideration moving from General Mills, Inc., to the Kell Mills or their stockholders. The contracting parties were different and neither contract was connected with or formed part of the other. Petitioners all returned the profits made on these sales in their individual capacities and paid tax thereon at the individual rate. This alternative claim is decided against the respondent.

The remaining issue relates to the loan of stock by Frank Kell and wife to the Plant Flour Mills Co. and the Kansas Mill & Elevator Co. This issue affects only Frank Kell and wife. Without repeating the facts as found by us, it is sufficient to say that they were testified to by petitioner Frank Kell, T. C. Thatcher, an executive of the two mills, and C. M. Crowell, auditor and office manager for Frank Kell, all of whom testified that the conference and agreement took place between July 1 and July 8, 1929, before the sale of any of the stock was made, and that the written contracts of July 15, 1929, merely reduced to writing the previous oral agreement.

Respondent introduced no contradictory evidence, but merely pointed to the fact that the sale tickets were in the name of Frank

Kell. But this is of no consequence, for Kell was an officer of the borrowers and was selling for their account as provided in the loan contracts, as follows:

It is further understood and agreed that the Kansas Mill & Elevator Company, may at its option, sell for itself or sell through Frank Kell for its account, said shares or any part thereof, for the purpose of securing available cash. * * *

In the recent case of *Fremont C. Peck et al., Executors*, 31 B.T.A. 87, we held that, where stock was loaned under circumstances and agreements similar to those involved herein, a sale of the stock by the borrower resulted in no taxable gain to the lender. In that case Clara S. Peck loaned to the Brooklyn Daily Times a large block of Woolworth Co. stock, some of which the borrower sold, and the respondent taxed a gain thereon against her. Two written agreements were made evidencing the loans. One dated January 5, 1927, was as follows:

The Brooklyn Daily Times hereby acknowledges the receipt from Mrs. Carson C. Peck, of eighty-eight hundred (8,800) shares of the stock of F. W. Woolworth Co., certificates Nos. WO–43112/19, incl., W–15844/48, incl., W/20981, and W–20968/69, incl., which have been loaned to it by her, for its accommodation, and to assist it in financing and conducting its business; to be used as collateral, or sold, as may be needed for temporary requirements; and, for value received, hereby agrees to return such stock to Mrs. Carson C. Peck, or replace it with an equal number of shares, on or before January 1st, 1931, or at any previous date, upon thirty days written demand.

Any dividends declared on such stock, in the meantime to belong to her. In case the stock, or any part of it, is sold, the amount of the dividends that would have been received on such stock, if not sold, will be paid to her on January 1st, 1931, with interest from the date each such dividend would have been payable.

On or prior to January 2, 1928, 8,000 shares of stock of the same company were transferred under the following agreement of that date:

The Brooklyn Daily Times, Inc., hereby acknowledges receipt from Mrs. Carson C. Peck of eight thousand shares of the stock of the F. W. Woolworth Co. certificates numbered WO–43120/27, inclusive, which have been loaned to it by her for its accommodation and use in financing its business as may be needed for current requirements, and for value received, hereby agrees to return said stock to her, or if transferred, replace it with an equal number of shares on or before January 1st, 1933.

It is further agreed that in case the stock or any part of it is transferred, the amount of the dividends that would have been received on said stock if not transferred, shall be paid to her on January 1st, 1933.

It may be noted that the essential provisions of these agreements are substantially the same as those involved in the cases under consideration. In holding that no gain resulted from the sale to Mrs. Peck, the lender, we said:

The purpose of the transfer to the Times was merely to relieve its financial difficulties, in accomplishing which, Mrs. Peck was obviously deeply interested. In effectuating this purpose by the transfer of the Woolworth stock under the terms of these agreements, no idea of securing pecuniary profit to her is apparent. No agency or trust was created under which this stock was to be sold *for* petitioners' decedent, or petitioners. She intended to and did provide for the return to her of an equal number of shares of the same stock borrowed and the payment to her of any dividends paid thereon in the meantime, or, in the event of the sale of the stock, the equivalent thereof. However, no obligation upon the Times to account to petitioners' decedent, or petitioners, for any part of the proceeds of their sale of this stock, directly or indirectly, resulted from these agreements, or otherwise.

Under the terms of the recited agreements, decedent loaned this stock, not money, as in the case of *Frank E. Best, supra*. In exchange for the promises of the Times contained in these agreements, petitioners' decedent transferred the stock, together with all incidents of ownership therein, except the right to enjoy the dividends thereon. These incidents of ownership, so transferred, included the right to sell or hypothecate the stock for its own account. The Times exercised this right. No gain was derived by petitioners' decedent, or petitioners, in such sale. *Provost* v. *United States*, 269 U.S. 443; *James* v. *United States*, 63 Ct. Cls. 379. The assignment of error directed to the inclusion of such gain in the computation of the distributed deficiencies, is sustained.

In view of this case we hold that respondent erred in including as income any gain resulting from the sale of the General Mills, Inc., stock loaned to the Plant Flour Mills Co. or the Kansas Mill & Elevator Co.

As we understand the record, respondent determined that the Oklahoma corporations were properly merged and reorganized, and no question is raised relative to them, except the alternative raised by respondent at the hearing, which we have previously herein decided against him.

Reviewed by the Board.

*Decision will be entered under Rule 50.*